CYRIX CORPORATION, Plaintiff,

Texas Instruments Inc., SGS–Thomson Microelectronics, Inc., and International Business Machines, Corporation, Intervenors,

v.

INTEL CORPORATION, Defendant.

No. 4:92cv52.

United States District Court, E.D. Texas, Sherman Division.

Feb. 28, 1995.

George Allan Van Fleet, Harry M. Reasoner, Erica L. Krennerich, Vinson & Elkins,

Houston, TX, Albert E. Fey, Laurence S. Rogers, Kelsey I. Nix, Elaine A. Drager, Fish & Neave, New York City, Joseph Wilbur Wolfe, Wolfe Clark & Henderson, L.L.P., Sherman, TX, Richard Allan Sayles, Sayles & Lidji, Dallas, TX, Steven E. Aldous, Sayles & Lidji, Dallas, TX, for plaintiff.

Terence M. Murphy, Ronald Andrew Antush, Louis Touton, Ross S. Garsson, Jones Day Reavis & Pogue, Dallas, TX, Robert R. Weller, James L. Wamsley, Hal D. Cooper, Jones Day Reavis & Pogue, Cleveland, OH, Gerald W. Palmer, Jones Day Reavis & Pogue, Los Angeles, CA, for Texas Instruments Inc.

Frank Finn, Thompson & Knight, Dallas, TX, for SGS–Thomson Microelectronics, Inc.

Ernest Ryan Higginbotham, Strasburger & Price, Dallas, TX, Evan R. Chesler, Richard W. Clary, Robert H. Baron, Philip C. Korologos, Suja A. Thomas, Cravath Swaine & Moore, New York City, Donald J. Rosenberg, IBM Corp., White Plains, NY, for International Business Machines Corp.

Danny Lloyd Williams, Wayne Manford Harding, James Joseph Elacqua, Henry A. Petri, Jr., Thomas A. Miller, Arnold White & Durkee, Houston, TX, Ophelia S. Camina, Susman Godfrey, Dallas, TX, Carl Silverman, Intel Corp., Santa Clara, CA, Patricia A. Hubbard, Alan H. Blankenheimer, Daniel P. Quigley, Jonathan M. James, Chad S. Campbell, Steven R. Rodgers, Brown & Bain, Phoenix, AZ, Stephen H. Cagle, Arnold White & Durkee, Houston, TX, Paul F. Eckstein, Brown & Bain, Phoenix, AZ, Clyde Moody Siebman, Siebman & Reynolds, Sherman, TX, Joseph Kattan, Morgan, Lewis & Bockius, Washington, DC, for Intel Corp.

## AMENDED MEMORANDUM OPINION AND ORDER

PAUL N. BROWN, District Judge.

Pending before the Court for resolution are Intel Corporation's Supplemented Motion for Summary Judgment that Cyrix's Microprocessors Manufactured by IBM Are Not Licensed and Intervenor IBM's Motion for Summary Judgment, and the Court having considered the motions, the responses, the briefs and arguments of the parties, and all of the summary judgment evidence, is of the opinion that Intel's supplemented motion for summary judgment should be denied and Intervenor IBM's motion for summary judgment should be granted.

### Facts

The facts relevant to deciding these motions are not in dispute. In 1989, IBM and Intel entered into a Patent Cross License Agreement ("the IBM Agreement"). This Agreement, dated as of October 1, 1989, was amended as of January 1, 1994. However, the amendment did not change the scope of the cross licenses granted by the original Agreement.

IBM has manufactured and sold to Cyrix microprocessors primarily designed by Cyrix and IBM did not request Cyrix to design for IBM these microprocessors.

A microprocessor such as the ones manufactured and sold by IBM to Cyrix constitutes an IHS Product, as that term is defined in Section 1.2 of the IBM Agreement, and a Semiconductor Apparatus, as that term is defined in Section 1.22 of the Agreement.

A foundry relationship exists when a manufacturer uses its manufacturing facilities to make microprocessors that are designed by another company and then sells the microprocessors so produced to the other company.

IBM is acting as a foundry for Cyrix.

### Discussion

■ The parties do not contend that the IBM Agreement is ambiguous, and the Court finds the Agreement to be unambiguous. Section 12.1 of the IBM Agreement provides that it shall be construed and the legal relations between the parties shall be determined in accordance with the law of the state of New York. Under New York law construction of a contract is a question of law to be decided by the court when the terms of the agreement are unambiguous and its meaning is unaffected by parol evidence. *Shulman Investment Co. v. Olin Corp.*, 477 F.Supp. 623, 627 (S.D.N.Y.1979).

■ The motions present one issue for decision by the Court. Does the IBM Agree-

ment permit IBM to manufacture and sell to Cyrix free of claims of patent infringement certain microprocessors primarily designed by Cyrix, or stated more broadly, can IBM act as a foundry?

The provisions of the IBM Agreement that are especially pertinent to resolution of the issue presented by the motions read as follows:

1.1 "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes.

1.2 "IHS Product" shall mean an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; *provided, however,* that a Manufacturing Apparatus shall not be considered to be an IHS Product.

1.3 "IHS Program" shall mean a plurality of instructions capable of being executed by an IHS Product or Complex, whether or not such instructions are in a machine-readable form.

1.4 "Supply" shall mean, as to each party hereto, any article or matter designed for use in or by, and adapted to be effectively consumed in the course of operation of an IHS Product licensed herein to that party.

1.6 "IHS Complex" shall mean an aggregate of instrumentalities, which is the combination of one or more IHS Products licensed herein with other apparatus which is not an IHS Product, Manufacturing Apparatus, IHS Program or Supply.

1.23 "IBM Licensed Products" shall mean IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an IBM Licensed Product even though its elements are leased, sold or otherwise transferred at different times.

1.25 "INTEL Licensed Products" shall mean DP Products, Scientific Computer Apparatus, Local Communication Apparatus, Speech Recognition and Synthesis Products, DP Programs, DP Complexes, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an INTEL Licensed Product even though its elements are leased, sold or otherwise transferred at different times.

2.2 Subject to the provisions of Sections 2.7 and 3.3, INTEL, on behalf of itself and its Subsidiaries, hereby grants to IBM a worldwide, royalty-free, nonexclusive license under the INTEL Licensed Patents:

2.2.1 to make, use, lease, sell and otherwise transfer IBM Licensed Products and to practice any method of process involved in the manufacture or use thereof;

2.2.2 to have made and/or have designed Semiconductor Apparatus;

Intel contends that the IBM Agreement prohibits IBM from acting as a foundry for Cyrix. Intel argues that by defining IBM Licensed Products the parties intended to limit the license granted in Section 2.2.1 to products designed by IBM. It is Intel's position that the parties' definition of IBM Licensed Products places the same limitation on the products licensed under the IBM Agreement as was found by the Court in *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821 (Fed.Cir.1991) (*Atmel* case). The *Atmel* case involved the interpretation of a patent license agreement between Intel and Sanyo Electric Co. Ltd. and Tokyo Sanyo Electric Co. Ltd. ("Sanyo"). The agreement between Intel and Sanyo ("the Sanyo Agreement") first granted to Sanyo the right to manufacture and use and sell under certain conditions certain specifically identified Intel products and then in Section 3.5 the following grant was made:

3.5 Intel hereby grants and will grant to Sanyo an non-exclusive, world-wide royalty-free license without the right to sublicense except to its Subsidiaries, under INTEL Patents *which read on any Sa-*

*nyo Semiconductor Material, Semiconductor Device, Magnetic Bubble Memory Device, Integrated Circuit and Electronic Circuit products,* for the lives of such patents, to make, use and sell such products. (emphasis added)

Following this grant by Intel to Sanyo, Sanyo made an identical grant to Intel in Section 3.6 of the Sanyo Agreement.

The question before the court in the *Atmel* case was what Intel and Sanyo intended in Section 3.5 by "Sanyo semiconductor material, semiconductor device, magnetic bubble memory device, integrated circuit and electronic circuit products" ("the Sanyo limitation"). In the process of answering this question, the *Atmel* court stated:

> While there is no indication in the agreement as to what the parties meant by the Sanyo limitation, the use of that language in Paragraph 3.5 clearly evinces that the parties intended to restrict the grant in some manner.

*Id.* at 827.

After analyzing the Sanyo agreement, the Court concluded "for consistency of the agreement as a whole, the word Sanyo products as used in Paragraph 3.5 are properly construed to cover only Sanyo designed and manufactured products and to exclude parts designed by others." (page 828 of opinion). Sanyo, therefore, could not act as a foundry. Intel argues that in the IBM Agreement, IBM Licensed Products in effect means licensed IBM products and that the parties, therefore, intended a Sanyo limitation.

Intel recognizes the holding in *Intel Corp. v. ULSI System Technology, Inc.,* 995 F.2d 1566 (Fed.Cir.1993) that in the absence of a Sanyo limitation or some other expressed limitation a license "to make, to have made, to use, to sell ... and to otherwise dispose of licensed products" permits the licensee to act as a foundry and the purchaser of such products from the licensee would be free to use and/or resell the products free from claims of patent infringement; but, argues that the *ULSI* decision has no application to the IBM Agreement.

IBM contends that the IBM Agreement contains no Sanyo limitation and that it is licensed to act as a foundry. IBM argues that the Sanyo Agreement and the IBM Agreement are quite different and that the term IBM Licensed Products in Section 1.23 is merely an identification of the generic type of products licensed to IBM which are specifically defined elsewhere in the Agreement without any kind of limitation. In support of this argument, IBM points out that the products licensed to Intel are different from the products licensed to IBM (the only common product being semiconductor apparatus). IBM argues that it was necessary in drafting the Agreement to identify the different products licensed to Intel and IBM and that the simplest way was to identify the generic type of products licensed as IBM Licensed Products and Intel Licensed Products.

After a careful consideration of the entire IBM Agreement, the Court has concluded that the parties did not intend to limit the products licensed to only those products designed by IBM. The Court has been unable to find any reasonable basis for concluding otherwise. The IBM Agreement and the Sanyo Agreement are substantially different. In the Sanyo Agreement, a license was granted "under Intel patents which read on any Sanyo semiconductor material ... to make, use and sell such products." In effect, what was granted was the right to make, use and sell Sanyo products which were covered by the Intel patents. The IBM Agreement contains no such limitation. For example, Section 1.2 of the IBM Agreement defines IHS Product as follows:

> 1.2 "IHS Product" shall mean an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; *provided, however,* that a Manufacturing Apparatus shall not be considered to be an IHS Product.

Section 1.23 of the IBM Agreement states that IBM Licensed Products "shall mean IHS Products ..." The only logical conclusion is that the parties meant those IHS Products specifically identified in Section 1.2 of the Agreement. Section 1.2 does not limit the products to IBM designed products.

Had the parties intended for the license to be limited as argued by Intel, the parties could have easily inserted shall mean "IBM IHS products."

In the Sanyo Agreement internal conflicts within the agreement would have been created if the licensed products were not limited to Sanyo products. For example, if Sanyo had foundry rights, then other provisions of the agreement requiring Sanyo to pay royalties to Intel on some products would, in effect, make such products royalty-free. No internal conflict is created in the IBM Agreement by not limiting the license to IBM designed products.

Unless the term IBM Licensed Products as used in Section 2.2.1 was intended to have some limiting effect on the rights granted, the license granted by the IBM Agreement is the same type of broad license grant construed by the *ULSI* court to grant foundry rights. The Court is convinced that no such limitation was intended by the use of this language. Therefore, IBM has the right to act as a foundry and to make, use, lease, sell and otherwise transfer the microprocessors in question to Cyrix free of any claims of patent infringement. IBM's Motion for Summary Judgment should, therefore, be granted and Intel's Supplemented Motion for Summary Judgment should be denied.

Judgment will be entered accordingly.

IT IS SO ORDERED.

This Amended Order is effective as of December 8, 1994.