**CYRIX CORPORATION,**
Plaintiff–Appellee,

and

**SGS–Thomson Microelectronics, Inc., Plaintiff–Appellee,**

and

**International Business Machines Corporation, Plaintiff–Appellee,**

v.

**INTEL CORPORATION, Defendant–Appellant.**

No. 95–1246.

United States Court of Appeals, Federal Circuit.

March 5, 1996.

Rehearing Denied April 26, 1996.

Albert E. Fey, Fish & Neave, New York City, argued, for plaintiff-appellee Cyrix Corporation. With him on the brief were Laurence S. Rogers, Kelsey I. Nix and Elaine A. Drager.

Stephen E. Stein, SGS–Thomson Microelectronics, Inc., Carrollton, Texas, argued, for plaintiff-appellee SGS–Thomson Microelectronics, Inc.

Frank Finn, Bruce S. Sostek, Jane Politz Brandt and Beverly Ray Burlingame, Thompson & Knight, Dallas, Texas, were on the brief, for plaintiff-appellee SGS–Thomson Microelectronics, Inc.

Richard W. Clary, Cravath, Swaine & Moore, New York City, argued, for plaintiff-appellee Intern. Business Machines Corp. With him on the brief were Evan R. Chesler and Robert H. Baron.

James J. Elacqua, Arnold, White & Durkee, Houston, Texas, argued, for defendant-appellant. With him on the brief were Thomas A. Miller, Richard L. Stanley and Amber L. Hatfield (Peter N. Detkin, Intel Corporation, Santa Clara, California, of counsel).

Before MICHEL, Circuit Judge, NIES, Senior Circuit Judge, and LOURIE, Circuit Judge.

LOURIE, Circuit Judge.

Intel Corporation appeals from the decision of the United States District Court for the Eastern District of Texas entering judgment in favor of Cyrix Corporation, SGS–Thomson Microelectronics, Inc. (ST), and International Business Machines Corporation (IBM), and holding that IBM and ST acted

within the scope of their respective patent license agreements with Intel when IBM made, and ST had made, products for Cyrix. *Cyrix Corp. v. Intel Corp.*, 879 F.Supp. 672 (E.D.Tex.1995). Because the district court correctly interpreted the IBM–Intel and ST–Intel agreements and hence did not err in rendering a declaratory judgment of noninfringement in favor of Cyrix, ST, and IBM, we affirm.

## BACKGROUND

Cyrix designed and sold microprocessors. Since it did not have its own facility for manufacturing the microprocessors it designed, it contracted with other companies to act as its foundries. Under such an arrangement, Cyrix provided the foundries with its microprocessor designs, and the foundries manufactured integrated circuit chips containing those microprocessors and sold them to Cyrix. Cyrix then sold the microprocessors in the marketplace under its own brand name.

It was Cyrix's practice to use manufacturing facilities of companies that were licensed under Intel's patents. IBM was such a company; it had obtained a license to Intel's patents in a patent license agreement dated October 1, 1989.[*] The granting clause of the IBM–Intel agreement provided as follows:

2.2 Subject to the provisions of Sections 2.7 and 3.3, INTEL, on behalf of itself and its Subsidiaries, hereby grants to IBM a worldwide, royalty-free, nonexclusive license under the INTEL Licensed Patents:

2.2.1 to make, use, lease, sell and otherwise transfer IBM Licensed Products and to practice any method or process involved in the manufacture or use thereof;

2.2.2 to have made and/or have designed Semiconductor Apparatus;

2.2.3 to have made IBM Licensed Products (other than Semiconductor Apparatus) by another manufacturer for the use, lease, sale or other transfer by IBM....

The agreement defined "IBM Licensed Products" as follows:

1.23 "IBM Licensed Products" shall mean IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an IBM Licensed Product even though its elements are leased, sold or otherwise transferred at different times.

Cyrix also used ST as a foundry. Initially, ST manufactured the chips, but when ST was unable to meet Cyrix's demand, ST requested its affiliate in Italy, SGS–Thomson Microelectronics S.r.L. (ST–Italy), to manufacture the needed chips, which ST then sold to Cyrix.

ST was operating under a license agreement between Mostek and Intel, which ST acquired by assignment. The agreement contains the following granting clause:

INTEL grants and agrees to grant to MOSTEK non-exclusive, non-transferrable, world-wide licenses under INTEL PATENTS and INTEL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS.

The agreement defined "LICENSED PRODUCTS" as follows:

"LICENSED PRODUCTS" shall mean any product manufactured, used or sold by either party covered by patents of the other party.

It is undisputed that ST–Italy is legally not a "subsidiary" of ST and is thus not licensed under the ST–Intel agreement. ST therefore relied upon its "have made" rights to obtain products from ST–Italy, which it then sold to Cyrix to fulfill its contractual obligation.

Cyrix filed a declaratory judgment action against Intel; alleging a "reasonable apprehension" that it would be sued for patent infringement. Cyrix sought a declaration that it did not infringe the Intel patents,

[*] The agreement was amended on January 1, 1994, but this amendment did not change the scope of the license granted in the original agreement.

**1384**

claiming immunity on the ground that IBM and ST were both licensed under the patents. Cyrix's view was that because IBM and ST acted within the scope of their respective licenses from Intel, its sales of microprocessors were shielded from any holding of infringement, the microprocessors having been obtained from authorized licensees. *See Unidisco, Inc. v. Schattner,* 824 F.2d 965, 968, 3 USPQ2d 1439, 1441 (Fed.Cir.1987) ("Resale of the product by Unidisco could not infringe the patent if Unidisco purchased the product from an authorized seller."), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988).

IBM and ST intervened, seeking an adjudication of their rights under their respective agreements with Intel. On motions for summary judgment by Intel, IBM, and ST, the district court granted summary judgment for IBM and ST, and denied summary judgment for Intel. The district court also entered judgment for Cyrix.

The district court held that IBM had a right to act as a foundry in supplying microprocessors to Cyrix. It found that the definition of "IBM Licensed Products" in the IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM. The district court distinguished *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 828, 20 USPQ2d 1161, 1167–68 (Fed.Cir.1991) ("*Atmel* ") (construing the term "Sanyo ... products" in a license agreement as limiting the grant of rights to Sanyo-designed and Sanyo-manufactured products). The district court concluded that, unlike the situation in *Atmel,* an internal conflict in the IBM–Intel agreement was not created by construing the license grant to cover products other than IBM–designed products. The court considered the facts to be more analogous to those in *ULSI, see infra,* rather than to those in *Atmel. See Intel Corp. v. ULSI Sys. Technology, Inc.,* 995 F.2d 1566, 27 USPQ2d 1136 (Fed.Cir. 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994).

The district court also held that ST had the right to have microprocessors made for it by any third party, including ST–Italy, and the right to sell those microprocessors to

Cyrix. The district court found that the microprocessors were made for ST, not Cyrix, and that the supply agreement between ST and ST–Italy was not a sublicense that exceeded ST's rights under the ST–Intel agreement. The district court thus distinguished the case that Intel cited in support of its position, *E.I. du Pont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108, 1114–15, 227 USPQ 233, 237 (Del.1985) (holding that a third-party's manufacturing of a product for itself under a licensee's "have made" rights was a prohibited sublicense). This appeal followed.

## DISCUSSION

■ Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1576–77, 12 USPQ2d 1382, 1383 (Fed.Cir. 1989). We review *de novo* a district court's grant of summary judgment. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Interpretation of a contract is a question of law that we also review *de novo. ULSI,* 995 F.2d at 1569, 27 USPQ2d at 1138; *see also Hoskins Lumber Co. v. United States,* 20 F.3d 1144, 1147 (Fed.Cir.1994).

It is accepted by all the parties that there are no issues of fact before us. The question is solely whether IBM's and ST's agreements with Intel entitled them to make or have made the microprocessor products in question and sell them to Cyrix. Intel states that the ST appeal raises an issue of first impression.

### A. *IBM–Intel Agreement*

Intel argues that the IBM–Intel agreement does not support a grant of foundry rights. Intel relies upon the word "IBM" as modifying the term "licensed products" in arguing that this modifier is a so-called "Sanyo limitation," limiting the scope of the products licensed and indicating that the parties did not intend to provide foundry rights. *See Atmel,* 946 F.2d at 828, 20 USPQ2d at 1167–68 (discussing the limitation "Sanyo ...

products" in a patent license agreement). Intel also asserts that the "have designed" provision in the license does not provide IBM with the right to act as a foundry in manufacturing products designed by Cyrix.

Cyrix and IBM argue that the plain language of the IBM–Intel agreement grants to IBM the right to make and sell to Cyrix microprocessors that Cyrix designed. They argue that the "IBM" modifier in section 2.2.1 of the agreement was intended to distinguish "IBM Licensed Products" from "Intel Licensed Products," and that "IBM Licensed Products" as defined in the agreement are not limited to those products specifically designed by IBM and made for itself. They argue that the term "IBM" used in the term "IBM Licensed Products" is not a "Sanyo limitation." *See id.* at 826 n. 9, 828, 20 USPQ2d at 1166 n. 9, 1167–68.

■ We agree with the district court that IBM acted within the scope of the IBM–Intel agreement when it made and sold to Cyrix products designed by Cyrix. The agreement granted IBM the right to make and sell "IBM Licensed Products," which are defined elsewhere in the agreement and are not limited to products designed by IBM. Sections 2.2.1, which grants a license to sell "IBM Licensed Products," and 1.23, which defines "IBM Licensed Products," must be read together. When this is done, the granting provision essentially reads as follows:

> 2.2.1 to make, use, lease, sell and otherwise transfer *IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus* and to practice any method or process involved in the manufacture or use thereof;

The products so defined are not limited to IBM-designed products. They include categories of products defined without the IBM prefix. The agreement defined these items as follows:

> 1.1 "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record,

reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes.

> 1.2 "IHS Product" shall mean an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; *provided, however,* that a Manufacturing Apparatus shall not be considered to be an IHS Product.

> 1.3 "IHS Program" shall mean a plurality of instructions capable of being executed by an IHS Product or Complex, whether or not such instructions are in a machine-readable form.

> 1.4 "Supply" shall mean, as to each party hereto, any article or matter designed for use in or by, and adapted to be effectively consumed in the course of operation of an IHS Product licensed herein to that party.

> . . .

> 1.22 "Semiconductor Apparatus" shall mean any Semiconductor Material, Semiconductor Device, Semiconductor Memory and/or Integrated Circuit.

Accordingly, we conclude that the district court correctly held that "IBM Licensed Products" are not limited to products designed by IBM.

We also do not agree with Intel that the "IBM" modifier is analogous to the "Sanyo limitation" in *Atmel.* The agreement in *Atmel* contained the following provision:

> Intel hereby grants and will grant to Sanyo an [sic] non-exclusive, world-wide royalty-free license without the right to sublicense except to its Subsidiaries, under Intel Patents which read on any *Sanyo* Semiconductor Material, Semiconductor Device, Magnetic Bubble Memory Device, Integrated Circuit and Electronic Circuit products, for the lives of such patents, to make, use and sell *such products.*

*Atmel,* 946 F.2d at 826 n. 9, 20 USPQ2d at 1166 n. 9 (emphasis in original). We construed the term "Sanyo" to limit the products listed after that term. Such a construction was required because it gave meaning to the

term "Sanyo" which was consistent with other provisions of the contract. *Id.* at 827–28, 20 USPQ2d at 1167–68. Otherwise, the term "Sanyo" would have lacked meaning, and a contract must be construed if possible to give meaning to all its provisions. In contrast, the term "IBM Licensed Products" is thoroughly defined in the IBM–Intel agreement to provide no Sanyo-type limitation. *See ULSI*, 995 F.2d at 1570, 27 USPQ2d at 1140 (distinguishing the "Sanyo . . . products" limitation in *Atmel* because the agreement in *ULSI* contained no similar qualification to the product definition). Moreover, as argued by IBM, the "IBM" modifier is readily explained by its being distinguished from "Intel Licensed Products."

This case is more analogous to *ULSI* than *Atmel*. In *ULSI*, Hewlett–Packard Company (HP) acted as a foundry to make and sell math coprocessor chips to ULSI. HP obtained a license to Intel's patents under an agreement in which "each granted to the other an 'irrevocable, retroactive, nonexclusive, world-wide, royalty-free license[.]' " *Id.* at 1567, 27 USPQ2d at 1137. ULSI sought to be shielded from infringement of Intel's patents by purchasing the math coprocessor chips from HP, which was acting as an authorized seller. In concluding that HP's agreement with Intel provided HP with the right to act as a foundry for ULSI, we stated that, in contrast to the "Sanyo limitation" discussed in *Atmel*, "the licensing agreement between Intel and HP here contains no restriction on HP's right to sell or serve as a foundry." *Id.* at 1570, 27 USPQ2d at 1140. There was no "Sanyo limitation" in *ULSI*. The products that were licensed were defined broadly. Notwithstanding the presence of the modifier "IBM," the same is true here.

■ Intel also argues that the "have designed" provision of section 2.2.2 limits the products IBM is entitled to make to those designed for IBM, presumably meaning for IBM's sole use. We find no such limitation in the agreement. Section 2.2.2 by its plain terms granted IBM the right "to have made and/or have designed Semiconductor Apparatus[,]" defined in the agreement as "any Semiconductor Material, Semiconductor Device, Semiconductor Memory and/or Inte-

grated Circuit." The microprocessors in question surely meet the definition of "Semiconductor Apparatus." This provision contains no limitation to the designs of any particular entity. Therefore, the right to have designed, make, and sell Semiconductor Apparatus clearly entitled IBM to act as a foundry for Cyrix by making a product designed by Cyrix.

■ Intel also argues that section 2.2.3, providing a right to "have made" products only when the designs are furnished by IBM, limits IBM's right to have products designed by Cyrix. IBM did not have the products made for it, and thus this provision does not limit its rights to make and have designed the products it sold to Cyrix. Moreover, 2.2.3 relates to products "other than Semiconductor Apparatus." We do not accept Intel's argument that section 2.2.3's limitations with respect to other products somehow cut back on unambiguous rights granted in sections 2.2.1 and 2.2.2 regarding the products in question. In summary, IBM properly made and sold microprocessors under section 2.2.1; IBM properly had microprocessors designed under section 2.2.2; and IBM did not "have made" microprocessors under the more limited section 2.2.3. Thus, IBM did not act outside the terms of the Intel agreement. The district court accordingly did not err in granting a declaratory judgment of noninfringement in favor of Cyrix and IBM.

■ Intel also makes a policy argument premised on a preamble clause in its agreement with IBM in which the parties stated that "each expects to continue a research and development effort which will produce further patents and each may require a nonexclusive license under such patents of the other." Intel argues that interpreting the agreement in favor of IBM would discourage the research the agreement was intended to foster. That argument totally misses the mark. The meaning of that clause is simply that the parties were entering into the agreement to facilitate their future research, *i.e.*, to provide themselves with patent freedom for the future. Even if Intel never intended IBM to act as a foundry, this vague preamble cannot be interpreted to give effect to that intention if doing so would override clear

operative language in the agreement. This agreement clearly gave IBM the right to make and sell to Cyrix microprocessors designed by Cyrix.

## B. *ST–Intel Agreement*

■ Intel argues that the arrangement between ST and ST–Italy is in effect a sublicense, which it is clear is not permissible under the ST–Intel agreement. In particular, it argues that under ST's "have made" rights, ST is only permitted to have products made for itself. Intel posits that the arrangement among ST, ST–Italy, and Cyrix was a mere paper transaction, *i.e.*, a "sham." *See E.I. du Pont*, 498 A.2d at 1116, 227 USPQ at 238 (holding that a third party made a product for itself, not for a licensee, when it made a product and sold it to the licensee, who simultaneously sold it back to the third party).

ST and Cyrix argue that ST was acting within the scope of its "have made" rights. ST denies that its arrangement with ST–Italy was a "sham" and claims that it was using ST–Italy to manufacture products for it in order to meet its obligation to supply microprocessors to Cyrix. They distinguish *du Pont* on its facts, noting that in *du Pont* the party manufacturing under the "have made" right was also using the product itself, whereas here the product made under the "have made" right was sent to and eventually sold by the licensee.

We start with the clear proposition that, under its agreement, ST had the right to have the product made for it and to sell that product to third parties. It relied upon that right to have the product made by ST–Italy and to sell it to Cyrix. The district court found that the arrangement was distinguishable from that in *du Pont*. In *du Pont*, Carbide sought a license under du Pont's patent to manufacture a product known as methomyl, but du Pont refused to grant Carbide a license. *Id.* at 1111, 227 USPQ at 234. Carbide then entered into an agreement with Shell, du Pont's licensee, whereby Carbide would manufacture methomyl for Shell under Shell's "have made" rights and Shell would sell it back to Carbide. *Id.* Carbide would then use it (or sell it) as it wished. The

Supreme Court of Delaware, whose law governed that agreement, concluded that the two agreements, one to enable Carbide to manufacture methomyl for Shell and the other whereby Shell sold it back to Carbide, were two halves of a single business transaction. The net result was that they enabled Carbide to make and use the patented product. The court held that that was in effect a sublicense, which was prohibited under the Shell-du Pont agreement. *Id.* at 1115, 1117, 227 USPQ at 237–38.

The district court identified several important differences between the situation in *du Pont* and the arrangement among ST, ST–Italy, and Cyrix, and concluded in its Memorandum Opinion and Order as follows:

> The substance of the arrangement between Cyrix and ST and ST and ST–Italy is that when Cyrix needs wafers, it issues a purchase order to ST. ST then either manufactures the wafers itself at its Carrollton, Texas, facility or arranges for ST–Italy to manufacture the wafers at its Italian facility. ST is selling wafers. It is not selling or receiving payment for the use of its license from Intel. It has not authorized St–Italy to make the wafers for or sell them to anyone other than ST. The production of the wafers is for the use of ST, the original licensee, and not for the use of ST–Italy. This is a valid exercise of the have-made rights granted under the License Agreement and does not constitute a sublicense.

*Cyrix Corp. v. Intel Corp.*, 879 F.Supp. 666, 671 (E.D.Tex.1995).

We agree with the district court that the facts here are thoroughly distinguishable from those in *du Pont*. In *du Pont*, the arrangement was a sham. The third-party (Carbide) acting under Shell's "have made" rights was manufacturing and selling the product to Shell and then buying it back in what was only a set of paper transactions. *E.I. du Pont*, 498 A.2d at 1111, 227 USPQ at 234. Here, however, the third-party (ST–Italy) properly manufactured microprocessors under ST's "have made" rights, and ST then properly sold the products to a different entity, Cyrix. The two agreements, one permitting ST–Italy to manufacture micropro-

cessors for ST and the other providing for ST's sale of microprocessors to Cyrix, were separate business transactions. As the district court found, ST was using both its own facility and ST–Italy's to satisfy its obligation to provide microprocessors to Cyrix. The products manufactured by ST–Italy were made for ST. If the facts in this case had been that Cyrix made the product for ST under ST's "have made" rights and then ST sold the product back to Cyrix, then they would have been analogous to those in *du Pont*, but those are not our facts. We accordingly conclude that the district court did not err in holding that the arrangements among ST, ST–Italy, and Cyrix were a valid exercise of ST's "have made" rights under its agreement with Intel. The district court thus did not err in granting a declaratory judgment of noninfringement in favor of Cyrix and ST.

We have considered the other arguments raised by Intel and conclude that they do not compel reversal of the district court's judgment.

## CONCLUSION

Judgment was properly entered in favor of Cyrix, IBM, and ST on their respective complaints. In particular, the district court did not err in concluding that the IBM–Intel agreement provided IBM with the right to make microprocessors designed by Cyrix and sell those microprocessors to Cyrix. The district court also did not err in concluding that ST acted within the scope of its "have made" right under the ST–Intel agreement when it had ST–Italy make the microprocessors and then sold them to Cyrix.

***AFFIRMED.***