**TULIP COMPUTERS INTERNATIONAL B.V., Plaintiff,**

**v.**

**DELL COMPUTER CORPORATION, Defendant.**

No. CIV.A.00–981–KAJ.

United States District Court, D. Delaware.

May 1, 2003.

Steven J. Balick, Ashby & Geddes, Wilmington, DC, for plaintiff.

Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE, for defendant.

## MEMORANDUM ORDER

JORDAN, District Judge.

## I. INTRODUCTION

This is a patent infringement lawsuit involving U.S. Patent No. 5,594,621 (issued Jan. 14, 1997) ("the '621 patent") owned by Tulip Computer International B.V. ("Tulip"), a Dutch corporation with its principal place of business in the Netherlands.[1] (Docket Item ["D.I."] 1.) On November 24, 2000, Tulip filed its complaint, asserting that Dell Computer Corporation ("Dell"), a Delaware corporation with its principal place of business in Texas, is infringing the '621 patent. (*Id.*) Dell answered Tulip's allegations of infringement on June 19, 2001, denying Tulip's claims of infringement and asserting the invalidity and the unenforceability of the '621 patent. (D.I.6.)

The magistrate judge issued a February 4, 2003, Report and Recommendation ("the Report") (D.I.454) and accompanying Order (D.I. 453) addressing, among other things, Dell's motion for partial summary judgment on failure to mark and noninfringement (D.I.344) and Tulip's cross-motion for summary judgment on failure to mark (D.I 363). Both Tulip and Dell have objected to the Report.[2] (D.I. 460; D.I. 463.) Accordingly, the Court has conducted a *de novo* review, informed by the parties' submissions to date, to address those objections. The Court concludes that Tulip's objection is partially well-founded and that the Report should be rejected in so far as it recommends that Tulip's damages be limited under 35 U.S.C. § 287(a).

## II. BACKGROUND

The '621 patent is entitled "Motherboard for a Computer of the AT Type, and a Computer of the AT Type Comprising Such Motherboard." The invention concerns the placement of a riser card connector at a specific location on a computer motherboard and the arrangement of expansion board connectors on a riser card. (D.I. 454; *see also* '621 Patent at col. 4 I. 36 to col. 5′ I. 61.) On October 1, 1994, Tulip entered into a cross-license agreement ("the 1994 Agreement") with International Business Machines Corporation ("IBM") under which IBM was granted a license pertaining to "all [Tulip] patents ... issued or issuing on patent applications entitled to an effective filing date prior to October 1st, 1999...." (D.I. 346, Ex. 4 at § 1.8.) On January 1, 1998, the 1994 Agreement was replaced with a new cross-licensing agreement between Tulip and IBM ("the 1998 Agreement") granting IBM a license pertaining to "all patents ... of TULIP ... issued or issuing on patent applications entitled to an effective filing date prior to December 31, 2002...." (*Id.*, Ex. 5 at § 1.3.) The '621 patent was filed with the United States Patent and Trademark Office on June 13, 1995 and issued on January 14, 1997 and was, therefore, covered by the 1994 Agreement and is now covered by the 1998 Agreement.

Of importance to the issue presently before the Court, the 1998 Agreement contains the following provisions:

---

1. This action was originally assigned within this Court to the Honorable Roderick R. McKelvie. (D.I.1.) Judge McKelvie retired from the Court in 2002 and the case was referred to Magistrate Judge Mary Pat Thynge. (*See* D.I. 199.) The case was reassigned to the undersigned on January 6, 2003. (D.I.427.)

2. Tulip also moved the Court for reconsideration (D.I.462) but, in view of the Court's present Memorandum Order, the Court considers that motion to be moot. In a separate Order of today's date the Court addresses additional issues, beyond the marking issue, to which the parties have lodged objections.

2.1 Each party, as Grantor, on behalf of itself and its Subsidiaries grants to the other, as Grantee, a worldwide, non-exclusive License under Grantor's Licensed Patents:

(a) to make (including the right to use any apparatus and practice any method in making), use, import, offer for sale and lease, sell and/or otherwise transfer Grantee's Licensed Products; and

(b) to have Grantee's Licensed Products made by another manufacturer for the use and/or lease, sale or other transfer by Grantee only when the conditions set forth in Section 2.2 are met.

2.2 The license to have products made granted in Section 2.1(b) to Grantee:

(a) shall only apply when the specifications for such Grantee's Licensed Products were created by Grantee (either solely or jointly with one or more third parties);

.     .     .     .     .

(d) shall not apply to any products in the form manufactured or marketed by said other manufacturer prior to Grantee furnishing of said specifications.

(*Id.*, Ex. 5 at §§ 2.1, 2.2.)

Section 1.7 of the 1998 Agreement describes products subject to Section 2.1 of the agreement as "IHS Product." (*Id.*,

Ex. 5 at § 1.7.) An "IHS Product" "mean[s] an Information Handling System" (*Id.*, Ex. 5 at § 1.2) which, in turn, is defined as "any instrumentality or aggregate of instrumentality primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes." (*Id.*, Ex. 5 at § 1.1.) Computer and computer components covered by the '621 patent fit the category of "IHS Products" as defined in Section 1.1 of the 1998 Agreement.

On July 21, 1994, IBM entered into a remarketing agreement with Dell to act as a reseller of computer equipment manufactured by Dell. (*Id.*, Ex. 12.) Pursuant to this agreement, IBM made off-the-shelf purchases of products manufactured by Dell and resold them to its customers.[3] (D.I. 345 at 5–8.) Tulip asserts that some of those products infringe its '621 patent.[4] (D.I. 364 at 1.) Dell asserts that IBM's sale of Dell products that allegedly infringe the '621 patent creates a limitation on Tulip's potential damages in this case. (D.I. 344.) Dell reasons that because IBM, as Tulip's licensee, sold those products without placing a patent mark on them, the provisions of 35 U.S.C. § 287(a) are applicable.[5] (*Id.*) Accordingly, Dell moved the

---

**3.** There is no contention that the Dell products purchased by IBM and alleged to infringe Tulip's patent were designed specifically for or by IBM. Further, there is no contention that Tulip authorized the manufacture of these products or IBM's purchase and resale of them.

**4.** The Court previously determined that some of the products IBM purchased from Dell did in fact infringe Tulip's '621 patent. (D.I. 419; D.I. 420.)

**5.** Section 287(a) provides as follows:

Patentees, and persons making, offering for sale, or selling within the United States

any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be

Court for partial summary judgment on failure to mark and noninfringement. (D.I.344.) Tulip cross-moved the Court on the issue of marking, asserting that IBM's sale of Dell manufactured products did not trigger Section 287(a). (D.I.363.)

The magistrate judge, relying on *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed.Cir. 1996), and *Thorn EMI N. AM., Inc. v. Hyundai Electronics Indus. Co., LTD.*, C.A. No. 94–332–RRM, 1996 U.S. Dist. LEXIS 21170 (D.Del. July 12, 1996), held that the allegedly infringing product manufactured by Dell and purchased by IBM for resale was product that IBM was licensed to sell by Tulip under the 1998 Agreement. Therefore, the magistrate judge concluded, since IBM was Tulip's licensee, IBM's failure to mark the products it purchased from Dell prevents Tulip from "recover[ing] damages from Dell for the period of time beginning on the date of IBM's first shipment to its customers of ... [product] covered by the '621 patent until Dell received actual notice of the '621 patent on March 10, 2000[ ]" under Section 287(a). (D.I. 454 at 34.)

Tulip objects to the magistrate judge's interpretation of the IBM–Tulip license agreement, particularly, as that interpretation invokes Section 287(a). (D.I.460.) Dell, although it received a favorable decision by the magistrate judge on the issue of marking, objects to the manner in which the magistrate judge applied the damage restriction imposed by that section. (D.I. 463.)

## III. STANDARD OF REVIEW

The Court reviews these objections *de novo* under 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b). Since this matter arises in the context of summary judgment, the Court applies the standard of summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A Rule 56(c) movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant must be given the benefit of all justifiable inferences and a court must resolve any disputed issue of fact in favor of the nonmovant. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## IV. DISCUSSION

■■■ The material facts, as set forth above, are not in dispute. The 1998 Agreement between IBM and Tulip is governed by New York State law. (D.I. 364, Ex. B at § 7.14.) Under New York law, "the primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Sayers v. Rochester Telephone Corp. Supp. Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993). A contract is construed as a whole, giving effect to each of its provisions. *Thomas v. Price*, 631 F.Supp. 114, 123 (S.D.N.Y.1986); *see also Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 217 N.Y.S.2d 1, 176 N.E.2d 37 (N.Y.1961) ("[a] court should not 'adopt an interpretation which will operate to leave a provision of a

---

recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a) (2003).

contract without force and effect.'"); *Mir v. Mir,* 135 A.D.2d 690, 691, 522 N.Y.S.2d 590 (N.Y.App.Div.1987) (recognizing "well settled rule of contract construction that an agreement should be interpreted to avoid inconsistencies and to give meaning to all of its terms and provision") (citing 22 N.Y. Jur 2d, Contracts, §§ 221, 222).

■ IBM is a licensee of Tulip pursuant to the 1998 Agreement. In addition to governing patent owners, the provisions of 35 U.S.C. § 287(a) extend to licensees. 35 U.S.C. § 287(a); *see also, e.g., Devices for Medicine, Inc. v. Boehl,* 822 F.2d 1062 (Fed.Cir.1987). Thus, while an infringer's failure to mark does not implicate Section 287(a), *Maxwell v. K Mart Corp.,* 880 F.Supp. 1323, 1337 (D.Minn.1995) (a patent owner is not charged with the activity of a third party absent a contractual relationship), a licensee's failure to mark does bear consequences for a patent owner seeking damages for infringement. A patent owner bears responsibility to ensure that "licensees ... and other authorized parties ... comply" with Section 287(a). *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1111–12 (Fed.Cir.1996), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997).

As Dell's marking defense arises in the context of sales by IBM and not Tulip, the Court, before proceeding to a consideration of the damage limiting provisions of Section 287(a), must first determine whether IBM's activities, in relation to those sales, should be imputed to Tulip. If so, Tulip is accountable under Section 287(a) for the actions of its licensee. If IBM was not acting in accordance with its licensing obligations when executing the sales in question, then Tulip should not bear the consequences for the unauthorized activities of IBM and Dell. *See Maxwell,* 86 F.3d at 1111–12; *Maxwell,* 880 F.Supp. at 1337 (D.Minn.1995).

The magistrate judge held that IBM's purchase and sale of allegedly infringing product from Dell was conduct imputable to Tulip. (D.I. 454 at 34.) The magistrate judge reasoned that IBM, pursuant to Section 2.1 of the 1998 Agreement, was authorized, as Tulip's licensee, to purchase and sell the allegedly infringing product manufactured by Dell since that activity constituted the purchase and sale of "Licensed Product" under the "make, use, or sell" grant of Section 2.1(a) of the 1998 Agreement. (D.I. 454 at 12–24.) It is on that first analytical point that the Court disagrees with the magistrate judge's Report (D.I.454) and accompanying Order (D.I. 453).

The magistrate judge relied primarily on two cases, *Cyrix* and *Thorn EMI* (a case applying *Cyrix*), in addressing Dell's marking arguments. In Cyrix, the Federal Circuit was confronted with two Intel patent license agreements. 77 F.3d at 1383–84. The first license agreement was with IBM. *Id.* The second was with SGS–Thomson Microelectronics, Inc. ("ST") via assignment from Mostek. *Id.* The issue with regard to the IBM–Intel license agreement was whether it conveyed the right for IBM to manufacture microprocessors covered by Intel's patents for the Cyrix Corporation ("Cyrix") for resale by Cyrix under Cyrix's brand name. *Id.* The issue with regard to the ST–Intel license agreement was whether it conveyed the right for ST to have products covered by Intel's patents manufactured by SGS–thomson Microelectronics S.r.L. (ST–Italy) for ST for resale to Cyrix. *Id.*

The operative language of the IBM–Intel license agreement at issue in the case provided as follows:

> "2.2 Subject to the provisions of Sections 2.7 and 3.3, INTEL, on behalf of itself and its Subsidiaries, hereby grants to IBM a worldwide, royalty-free, non-exclusive license under the INTEL Licensed Patents:

2.2.1 to make, use, lease, sell and otherwise transfer IBM Licensed Products and to practice any method or process involved in the manufacture or use thereof;

2.2.2 to have made and/or have designed Semiconductor Apparatus;

2.2.3 to have made IBM Licensed Products (other than Semiconductor Apparatus) by another manufacturer for the use, lease, sale or other transfer by IBM . . . ."

*Id.* at 1383. "IBM Licensed Products" were defined in the IBM–Intel license agreement as

"IHS [Information Handling System] Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an IBM Licensed Product even though its elements are leased, sold or otherwise transferred at different times."

*Id.* "Semiconductor Apparatus" were defined in the IBM–Intel license agreement as "any Semiconductor Material, Semiconductor Device, Semiconductor Memory and/or Integrated Circuit." *Id.* at 1385.

The operative language of the ST–Intel licensee agreement at issue in the case provided as follows:

"INTEL grants and agrees to grant to MOSTEK non-exclusive, non-transferrable, world-wide licenses under INTEL PATENTS and INTEL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS."

*Id.* "Licensed Products" were defined as "any product manufactured, used or sold by either party covered by patents of the other party." *Id.* at 1383.

IBM and Cyrix argued that the IBM–Intel agreement granted IBM foundry rights to manufacture products covered by Intel's patents for Cyrix, even if Cyrix supplied the specifications, because the agreement contained no provision to the contrary. 77 F.3d at 1383–84. Similarly, ST argued that, pursuant to its "have made" rights under the ST–Intel agreement, it was authorized to have ST–Italy act as its foundry to manufacture products covered by Intel's patents for resale to Cyrix.[6] *Id.* The district court held that IBM was licensed to act as Cyrix's foundry because the definition of "IBM Licensed Products" in the IBM–Intel license agreement "did not limit the products it was licensed to sell to those designed by IBM." *Id.* at 1384. The district court also held that ST was authorized pursuant to the ST–Intel license's "have made" provision to have ST–Italy make products covered by Intel's patents for resale to Cyrix. *Id.* In this regard, the district court reasoned that the arrangement was not an improper sub-license since ST had ST–Italy manufacture the products for ST not Cyrix, later resale to Cyrix was, therefore, of no moment. *Id.*

The Federal Circuit agreed with the lower court's analysis. *Id.* at 1384–1388. In particular, as to the IBM–Intel agreement the Federal Circuit noted that the agreement was "not limited to IBM-designed products[ ][,]" *id.* at 1385, but, instead, when the provisions provided, *supra,* were read together, the agreement "granted IBM the right 'to have made and/or have designed Semiconductor Apparatus[,]' defined in the agreement . . . [to include] [t]he microprocessors in question. . . ." *Id.* at 1386.

In *Thorn EMI,* another license agreement involving IBM was at issue. *Thorn*

---

**6.** ST–Italy is not a "subsidiary" of ST. 77 F.3d at 1383. St–Italy thus has no license rights in Intel's patents pursuant to the ST–Intel license. *Id.*

*EMI,* 1996 U.S. Dist. LEXIS 21170, at \*2–\*3. This time the license agreement was between IBM and INMOS International plc, the predecessor of Thorn EMI North America, Inc. ("TENA") (hereinafter the IBM–TENA license agreement). *Id.* In that case, the district court was confronted with the issue of whether the license agreement between IBM and TENA insulated third party foreign manufactures, Hyundai Electronics Industries Co., LTD. and Hyundai Electronics America ("Hyundai"), from liability for inducing patent infringement for the manufacture and sale of products that infringe TENA's patent rights since those products were purchased "off the shelf" by IBM, TENA's licensee. *Id.* at \*2–\*10. The court held that the IBM–TENA license agreement did insulate Hyundai from patent infringement, relying on *Cyrix. Id.* at \*10–\*14.

The following provisions of the IBM–TENA license agreement were at issue in the case:

"2.8　INMOS, on behalf of itself and its Subsidiaries, grants to IBM a worldwide, fully paid-up nonexclusive license under the INMOS Licensed Patents:

2.8.1.　to make, use lease, sell and otherwise transfer IHS Products and to practice any process involved in the manufacture or use thereof;

.　　.　　.　　.　　.

2.8.2.　to make, have made, use and have used IHS Manufacturing Apparatus and to practice and have practiced any method involved in the manufacture or use thereof; provided, however, that the rights granted in this Section 2.8.2 shall not serve to enlarge the scope of the rights granted in Section 2.8.3; and

2.8.3.　to have made IHS Products by another manufacturer for the use, lease, sale or transfer by IBM, only when all the following conditions are met:

2.8.3.1 the designs, specifications and working drawings for the manufacture of said IHS Products are furnished by, and originate with, IBM (or with IBM's contractor, whether or not said contractor is also said other manufacturer, provided that any patents and patent applications, based upon inventions made in the course of the contract, which cover any IHS Product or any portion thereof which is the subject of the contract, are licensable by IBM to INMOS hereunder), and

2.8.3.2 said designs, specifications and working drawings are in sufficient detail that no additional designing by the manufacturer is required other than adaptation to the production processes and standards normally used by the manufacturer which changes the characteristics of the products to a negligible extent.

.　　.　　.　　.　　.

1.1　'Information Handling System' shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle, or utilize any form of information, intelligence, or data for business, scientific, control or other purpose."

*Id.* at \*5–\*9.

Although the foregoing provisions are similar to the ones at issue in Cyrix, they differ in this significant respect: the "have made" provisions of the IBM–TENA license agreement specifically restrict the manner or mode in which IBM can engage others to make products for IBM that are covered by TENA's patents. In particular, Section 2.8.3 of the IBM–TENA license agreement restricts IBM's "have made" rights by requiring that any TENA patented product be made for IBM in accordance with Sections 2.8.3.1 and 2.8.3.2. This is in contrast to the IBM–Intel and

ST–Intel license agreements at issue in *Cyrix* which did not so restrict the manner or mode in which IBM or ST could engage others to make Intel licensed products (*see* Section 2.2.2 of the IBM–Intel license and the discussion of "Semiconductor Appartus," *supra*). Instead, those "have made" provisions conveyed a broad right to IBM and ST to have Intel patented articles manufactured by third parties.

The court in *Thorn EMI*, however, did not place any emphasis on this distinction, saying instead that the "IHS products" language in Section 2.8.1 of the IBM–TENA license was analogous to the "IBM Licensed Products" language in *Cyrix* and, therefore, that the Federal Circuit's analysis in *Cyrix* applied with equal force to the provisions at issue. *Id.* at *13–*14.

■ In the case at bar, the Court declines to read *Thorn EMI* as requiring the Court to ignore key language of the license agreement in issue. Indeed, that would be contrary to both New York law and the Federal Circuit's contractual analysis of the license agreement at issue in *Cyrix*. In *Cyrix*, the question of infringement in the case turned, ultimately, on the manufacture and sale of "Semiconductor Apparatus" discussed in Section 2.2.2 of the agreement at issue. *Id.* at 1386. The Federal Circuit considered the entire contract before it and reasoned that the contract gave IBM the right to "have made" or "have designed" "Semiconductor Apparatus", and, thus, no infringement existed. *Id.*

Exactly as the Federal Circuit's *Cyrix* analysis demonstrates, a contract must be read as a whole. *See also, e.g., Thomas,* 631 F.Supp. at 123. The Court does not read *Thorn EMI* as changing this well

established principled of contract law. Section 2.2 of the IBM–Tulip license presently before the Court provides that the grant to IBM of "have made" rights in Section 2.1(b) applies only "when the specifications for such Grantee's Licensed Products were created by Grantee (either solely or jointly with one or more third parties) ... [and] shall not apply to any products in the form manufactured or marketed by said other manufacturer prior to Grantee furnishing of said specifications." The Court finds that language to be controlling. To interpret the "make, use or sell" language in Section 2.1(a) of the 1998 Agreement as overriding the specific restrictions in Sections 2.1(b) and 2.2(a) and (d) would be to render those latter Sections a virtual nullity, a result clearly at odds with New York law.[7] As noted, *supra,* in Cyrix, the Federal Circuit addressed a patent licensing agreement similar to the one at issue before this Court. The IBM–Intel licensing agreement before the Federal Circuit in *Cyrix* contained one "have made" or "have designed" provision, one "have made" provision, and one "make, use, lease, sell, and otherwise transfer" provision. *Id.* at 1383. In rendering its decision the Federal Circuit dismissed the argument that the "have designed" or "have made" provision, "limits the products IBM is entitled to make to those designed for IBM, presumably meaning for IBM's sole use[ ]" since "no such limitation [was found] in the agreement." *Id.* at 1386. Similarly, the Federal Circuit dismissed Intel's argument that the "have made" provision restricts "IBM's right to have products designed by Cyrix." *Id.* In contrast, the provisions of the 1998 Agreement before this Court, when read togeth-

---

**7.** In its motion, Dell asserts that the restriction on IBM's "have made" rights contained in Section 2.2 of the 1998 Agreement "is not at issue in Dell's motion." (D.I. 345 at 4, n. 3.) Dell, however, provides no other rationale, except this blanket assertion, why the Court should apply one broad provision of the 1998 Agreement to the exclusion of other more restrictive provisions.

er, do specifically restrict the licensee's, IBM's, rights under the license. Section 2.1(b) of the 1998 Agreement states that IBM's "have made" rights are restricted by Section 2.2. Under Section 2.2(a) and (d) IBM's Section 2.1(b) "have made" rights only apply after Tulip supplies the specifications for those products to IBM before IBM has those products made by another manufacturer. Since, in connection with IBM's purchase and resale of Dell equipment, IBM did not comply with Section 2.2 of the 1998 Agreement, IBM was not acting pursuant to that agreement when it sold the allegedly infringing product to its customers, therefore, IBM's conduct cannot be imputed to Tulip.

Accordingly, since IBM did not have Dell make those products in accordance with the specific restrictions in the IBM–Tulip license, IBM was not acting within its license rights when it purchased the allegedly infringing product from Dell and resold them to its customers. To read the "make, use, or sell" language to mean IBM was entitled to sell infringing product acquired from a third party makes no sense, given the explicit "have made" limitations in the license. Those activities, therefore, cannot be imputed to Tulip. Moreover, the grant in Section 2.1(a) of rights to "make . . ., use, import, offer for sale and lease, sell and/or otherwise transfer Grantee's [Tulip's] Licensed Products" applies only to "Grantee's Licensed Products." The products purchased from Dell, an accused infringer, were not licensed by Tulip, and the word "sell" cannot properly be used to bootstrap those products into coverage by the license. That word, in light of the specific restrictions in the contract, will not bear that load. Section 2.1(a) applies to products Tulip has licensed. It does not apply to the transfer of unauthorized products allegedly covered by Tulip's patents. Since neither IBM nor Dell was authorized by Tulip to make or sell or otherwise use or dispose of the allegedly infringing products involved in this case, 35 U.S.C. § 287(a) is not implicated by either IBM's or Dell's unauthorized sale of articles allegedly covered by the '621 patent. *Maxwell,* 86 F.3d at 1111–12.

Accordingly, IT IS HEREBY ORDERED THAT

Dell's objections (D.I.463) to the Report are DENIED and Tulip's objections (D.I. 460) to the Report are GRANTED to the following extent: the Court does not adopt those portions of the Report (D.I.454) and accompanying Order (D.I.453) which address 35 U.S.C. § 287(a) in response to Dell's motion for partial summary judgment on failure to mark and noninfringement (D.I.344) and Tulip's cross-motion for partial summary judgment on failure to mark (D.I.363).